IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| KAREN DIANNE SELLERS, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:15-cv-38 |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | By: Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Karen Dianne Sellers asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision denying her application for disability insurance

benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434.

The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 15. Having

considered the administrative record, the parties' briefs, and the applicable law, I find that the

Commissioner's decision is not supported by substantial evidence. Therefore, I recommend that

the Court **GRANT** Sellers's Motion for Summary Judgment, ECF No. 20, **DENY** the

Commissioner's Motion for Summary Judgment, ECF No. 26, and **REMAND** the case for

further administrative proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62

(1983); 20 C.F.R. § 404.1520(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Sellers applied for DIB on May 1, 2012, alleging disability caused by a broken ankle and back pain. Administrative Record ("R.") 70, ECF No. 12.[1] At the time of her alleged onset date of September 28, 2011, she was fifty-one years old. *Id.* Disability Determination Services ("DDS"), the state agency, denied her claim at the initial, R. 70–80, and reconsideration stages, R. 84–94. Sellers's request for an administrative hearing was initially denied by ALJ Brian P. Kilbane as untimely, R. 98–99, but the Appeals Council vacated the ALJ's order of dismissal and remanded the case to him for a hearing, R. 101–02. On March 20, 2014, Sellers appeared with counsel for the hearing before ALJ Kilbane. R. 34–58.

The ALJ denied Sellers's claim in a written decision issued on April 21, 2014. R. 14–27. He found that Sellers had severe impairments of degenerative disc disease ("DDD") of the lumbar spine (status post January 2013 and August 2013[2] surgeries), mood disorder, and borderline obesity. R. 17. Sellers's impairment of gastroesophageal reflux disease was found to be non-severe. *Id.* The ALJ next determined that none of Sellers's impairments, alone or in combination, met or medically equaled the severity of a listed impairment. R. 17–18.

---

[1] Sellers also appears to have applied for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–1383f. R. 59. This application was denied on initial review, R. 59–69, and the record does not indicate that Sellers pursued it any further. Thus, on appeal, I consider only her application for DIB.

[2] The ALJ actually stated at step two that Sellers's second back surgery was performed in June 2013. R. 17. The record does not reflect that she underwent any surgery at this time. Nonetheless, this appears to be nothing more than a harmless typographical error, as the ALJ acknowledged in his narrative discussion that Sellers's second operation took place in August 2013, R. 22, which is consistent with the record.

3

As to Sellers's residual functional capacity ("RFC"), the ALJ found that she could perform light work[3] involving standing or walking for four to six hours and sitting for two to four nonconsecutive hours in an eight-hour workday, rarely bending or performing other activities of forward flexion, and no restrictions with squatting; additionally, the ALJ determined that Sellers's nonexertional limitations restricted her to simple and repetitive tasks, with the potential ability to do some specific detailed or complex tasks. R. 18–25. Based on this RFC finding and the testimony of a vocational expert ("VE"), the ALJ determined that Sellers could not perform her past relevant work as a truck driver, as this work was classified as medium, but could perform other jobs existing in the national and regional economies, including nonpostal mail clerk, order clerk, and security guard. R. 25–26. He therefore concluded that Sellers was not disabled. R. 26–27. The Appeals Council denied Sellers's request for review, R. 1–3, and this appeal followed.

### III. Facts

*A.    Relevant Medical Evidence*

The record reflects Sellers's treatment history for a variety of issues dating back as far as November 2008. *See* R. 295, 308. Prior to the alleged onset date, Sellers made occasional complaints of depression to her primary care providers, R. 321–22, 640, although there is no indication that she complained of particularly severe symptoms or sought treatment from a specialist. Beginning in April 2010 and continuing into 2011, she also complained of chronic back pain, which she treated with Flexeril, over-the-counter medications, and ice. R. 634, 636–38, 640. On May 31, 2011, she began treatment with Dorothy Fensterer, D.C., at DeGraw

---

[3] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these lifting requirements can perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

Chiropractic Center, Inc., in South Boston, Virginia. R. 326–27. Sellers complained to Dr. Fensterer of pain in her lower and upper back, with radiating pain and numbness in her extremities, and Dr. Fensterer performed chiropractic manipulative therapy and electrical stimulation. R. 326–29.

Following the alleged onset date, Sellers treated with her primary care provider, Claudia Perkins, N.P., on October 5, 2011, at which time she reported suffering from lower back pain and stated that she was not working. R. 320.[4] An MRI taken on November 10 showed DDD at L5-S1, with broad-based disc bulge and mild neural foraminal narrowing at that level and at L4-L5. R. 641. She reported the following day to NP Perkins, stating that she was experiencing low back pain that radiated down her right leg and that she planned to see a neurosurgeon. R. 319.

On November 18, Sellers reported to Debra Cobbeldick, P.A.-C., at Southern Virginia Orthopedics, complaining of back pain with no radiation, numbness, or tingling in her legs, and stating that the treatment from her chiropractor was ineffective in relieving the pain. R. 643–44. On examination, her reflexes were 2+ bilaterally, sensation of the legs was intact, and strength was 5/5. She had positive straight leg reflexes, though pain was better on the left with her knee bent. R. 643. She was not tender to palpation in the lumbar region but was tender to the left of the L3-L4 area. *Id.* PA Cobbeldick diagnosed mechanical back strain, injected Toradol, and prescribed Flexeril and Motrin. *Id.*

On November 29, Sellers returned to DeGraw Chiropractic Center and treated with Dale Williams, D.C. R. 330–34. She described ongoing pain that had been getting worse over the past two months and said she experienced numbness though her left leg down to the foot. R. 331. Her pain, which she rated 9/10 in intensity, was located at the left lumbar region at the lumbosacral

---

[4] Sellers also treated with Cornerstone Family Chiropractic between September 26 and November 11 for pain in her lower back and left shoulder, but the notes from these visits are not clearly legible. *See* R. 311–17.

5

area. *Id.* Sellers stated in a questionnaire that her pain was severe, varied little, and restricted her sleep, social life, and ability to travel. R. 333–34. She claimed that pain limited her ability to lift more than very light weights, walk, sit for more than one hour, and stand for more than ten minutes. *Id.* X-rays showed severe DDD at L5-S1. R. 330. On palpation, she had severe taut and tender fibers in the left lumbosacral area. R. 332. She exhibited positive Patrick-Fabere's Test, Nachlas Test, Ely's Sign, and Yeoman's Test bilaterally, as well as positive Higg's Test on the left. *Id.* Straight leg raise was positive at zero to thirty degrees on the left, with severe symptoms radiating to the lumbosacral area. *Id.* Toe walk, heel walk, and Bechterew's Sitting Test were negative bilaterally. *Id.* Her lumbar range of motion was limited on extension, flexion, left rotation, and left lateral flexion, and she was in severe pain upon lumbar flexion and left lateral flexion. R. 333. Dr. Williams recorded relevant diagnoses of somatic dysfunction of the lumbar region, lumbar disc displacement, sciatica, lumbar or lumbosacral disc degeneration, and idiopathic scoliosis. R. 333.

Sellers returned to Dr. Williams the following day and continued to complain of pain in the left lumbosacral area radiating to her left leg and foot. R. 335–36. Dr. Williams again observed that, upon palpation, Sellers had severe taut and tender fibers at the left lumbosacral area, as well as at the left sacroiliac area. R. 335. He provided decompression and chiropractic manipulative therapy for three to four areas. R. 336. Dr. Williams also advised Sellers to keep her knees bent while sitting or lying down, suggested that she periodically apply ice to her left lower back, and instructed her to perform lumbar range of motion exercises several times per day. *Id.* At a December 5 visit with NP Perkins, her back was non-tender and she was able to heel, toe, and tandem walk. R. 318. NP Perkins provided Toradol and discussed with Sellers her opiate use and refusal to see a neurosurgeon. *Id.* Sellers continued to visit Dr. Williams and Dr.

Fensterer several days per week from December 2011 into February 2012 with complaints of radiating pain in her lower back (albeit at varying levels of intensity) and received chiropractic manipulative therapy, along with decompression and ultrasound therapy. *See* R. 337–405.

On March 16, 2012, Sellers presented for a preliminary physical therapy assessment with Mike McClellan, P.T. R. 447–53. She rated the pain in her lower back at 10/10 and described it as radiating into the bilateral lower extremities, causing muscle soreness and weakness, and interfering with her ability to perform activities of daily living, ambulate, bend backward or forward, drive, do housework, lift or carry, do recreational activities, sleep through the night, and perform work activities. R. 447. PT McClellan observed that Sellers had poor posture, was tender along the left lumbar paraspinals, and had an antalgic gait. *Id.* She had positive bilateral straight leg raise. R. 448. Sellers tolerated her therapy well, *id.*, but stated that she could not continue because she was unable to afford it, R. 453.

On March 21, Sellers treated with Eduardo Fraifeld, M.D., at Southside Pain. R. 437–42. She again rated her pain at 10/10, which she said was average, and she claimed that at best her pain rated 8/10. R. 437. She endorsed numbness, but denied muscle spasms or weakness. She stated that her pain radiated into her left posterior leg, was exacerbated by postural activities and walking, and was alleviated by use of a cold compress, but not through use of opioid analgesics. *Id.* Dr. Fraifeld observed on examination that Sellers's gait and posture were normal. R. 439. She had full strength in her extremities, normal reflexes, and no difficulties with coordination. R. 440. Sellers was not tender to palpation over her spine, and her range of motion was within normal limits, but she had positive Slump Test and straight leg raise on the right and experienced pain with lumbar facet loading. R. 441. Psychiatric examination results were normal, with Sellers exhibiting intact associations, orientation times four, normal mood and affect, appropriate

judgment, normal speech, and intact thought processes. *Id.* Dr. Fraifeld prescribed amitriptyline and Neurontin, and he scheduled Sellers for a lumbar epidural steroid injection ("ESI"), R. 441–42, which was administered on March 29, R. 436.

Sellers returned to Dr. Fraifeld on April 11. R. 430–35. She claimed that her symptoms were unchanged since her last visit, with her back pain being worse than her leg pain, but stated that the numbness and burning in her legs was getting worse. R. 430. An X-ray of the lumbar spine showed DDD with significant height loss at L5-S1, facet hypertrophy particularly at the lower two levels, and no evidence of any slippage. R. 431. Physical examination findings were again mostly normal, *see* R. 432–33, although Sellers was exquisitely tender to palpation of the medial low back, exhibited intense pain on trunk extension and mild discomfort on lumbar flexion, and had severe bilateral pain with lumbar facet loading, R. 433. Dr. Fraifeld added a prescription for Nucynta. R. 434–35. He also administered a medial branch nerve block ("MBNB") at the bilateral sides of L3, L4, and L5, and he noted that Sellers exhibited a disproportionate reaction to the procedure and during examination:

> [Sellers] reported pain during placement of 25-gauge needles that seemed to be completely out of proportion to the procedure being performed. Almost immediately post procedure claimed she had numbness and weakness in [her] legs and could not move them well enough to walk within minutes[.] This was all gone at time of discharge[.] She denied any sensory deficit whatsoever. I examined all leg muscles individually and they were all 5/5 strength[,] however when she would stand up she would start wobbling as though she was going to fall[,] claiming her legs are weak but never actually falling[.] She appeared to be having an anxiety reaction or component of paralysis agitans[.] On exam she had no facet loading pain on the right[,] on the left she was claiming severe pain. It was entirely out of proportion to exam. While she has no allodynia, dysesthesia[,] or other abnormal neurological findings on exam, pressure so light it did not even blanch [my] finger, was causing her to complain of severe pain[.]

R. 434 (formatting altered from original).

Sellers visited again with Dr. Fraifeld on May 9. R. 426–29. She complained of worsening of her back and leg pain, and her husband stated that she could not do simple housework. R. 426. Dr. Fraifeld noted that an electromyography ("EMG") of the lower limbs taken the previous day, R. 549–50, was "unimpressive." R. 426.[5] In her review of systems, Sellers did not endorse decreased range of motion, joint pain or stiffness, muscle pain or weakness, numbness, or tingling. R. 428. Dr. Fraifeld prescribed MS Contin and noted that Sellers was scheduled for further MBNBs. R. 429. The following day, she complained to Dr. Fraifeld of experiencing anxiety. R. 425. Dr. Fraifeld noted that "[t]here clearly appears to be a component of anxiety and noncompliance in this patient," and he counseled Sellers on maintaining compliance with her medications. Id.

Sellers's treatment record is then silent until January 16, 2013, at which time she was evaluated for lumbar surgery at the Laser Spine Institute ("LSI"). R. 492–96. She complained of lower back pain rating 9/10 that was exacerbated by activity and prolonged standing, walking, or sitting. R. 492. She also complained of radiating pain, numbness, and tingling in her left leg. Id. On examination, she displayed normal neurological and psychological signs, and she had no atrophy, normal heel and toe walk, normal gait, no tenderness to palpation, and normal muscle strength. R. 494–95. She did have, however, painful, limited lumbar range of motion; positive Lasegue's Test, Slump Test, and straight leg raise on the left; and positive Dejerine's Triad. R. 494. An MRI showed DDD, bulging discs, and foraminal stenosis at L3-L4, L4-L5, and L5-S1, as well as spinal stenosis, facet degeneration/hypertrophy, and spondylolisthesis at L5-S1. R. 489; see also R. 552–53.

---

[5] The EMG showed mild to moderate motor sensory axonal (peroneal nerves) demyelinating polyneuropathy with no chronic neurogenic changes, no signs of reinnervation, and no current denervation. R. 550. There was no evidence of radiculopathy or plexopathy. Id.

At a January 17 visit with Vernon Morris, M.D., a surgeon at LSI, Sellers exhibited tenderness over her left lumbar spine, painful and limited range of motion, positive seated straight leg raise on the left, and intact strength and sensation. R. 491. A selective nerve root block at L5 on the left was positive for 100% relief. *Id.* On January 18, Dr. Morris performed a lumbar laminotomy and foraminotomy including partial facetectomy with decompression of the nerve roots at L5-S1 and destruction via thermal ablation of the paravertebral facet joints at L4-L5. R. 531–33. In the following months, Sellers reported little progress with continuing pain, numbness in her legs, stiffness, spasms, and difficulty walking. *See* R. 857–58 (Feb. 7); R. 855–56 (Feb. 15); R. 853 (Mar. 1); R. 852 (Mar. 4); R. 850–51 (Apr. 10); R. 846–47 (Apr. 16); R. 844 (Apr. 22); R. 842–43 (May 1); R. 841 (May 3); R. 840 (May 13); R. 838 (June 7).

An MRI taken on June 18 showed evidence of hemilaminectomy at L5-S1 with minimal residual disc bulge and no evidence of recurrent disc herniation or abnormal enhancement at that level. R. 759–60. It also showed a mild disc bulge at L4-L5 with encroachment of the neural foramina.[6] R. 760. On July 9, Sellers told Dr. Morris that she had realized 50% pain relief following her surgery, and she described her chief remaining complaint as axial greater than radicular symptoms, left slightly greater than right. R. 832.

Sellers was evaluated again at LSI on August 20. R. 716–23. She stated that her surgery had provided 90% relief from her symptoms for months before the symptoms returned and gradually worsened. R. 716. She claimed that her pain rated 2–5/10 when resting and 5–10/10 when active. *Id.* On examination, she was pleasant, cooperative, and not emotional or anxious. R. 720. She was oriented times three, alert, and had good insight and consistent affect. *Id.* She had a normal gait, could heel and toe walk normally, had negative provocative tests, and exhibited

---

[6] The findings at L4-L5 were reportedly similar to those shown in an MRI taken on February 23, 2012. R. 759–60. There is no other report of this MRI in the record.

normal strength except for slight weakness on left knee flexion and extension. R. 721. She was tender to palpation on the left at L3-L4, L4-L5, and L5-S1. *Id.* On August 21, Sellers underwent a diagnostic nerve root block at L4, which provided 95% relief. R. 724–26.

On August 23, Dr. Morris performed a lumbar laminotomy and foraminotomy including partial facetectomy with decompression of the nerve roots at L4-L5 on the left, and he administered a percutaneous lysis of adhesions/caudal ESI. R. 692–95. Dr. Morris's preoperative notes indicate that Sellers had improved about 95% from her January operation before her symptoms returned, she was unable to do housework, and her symptoms were provoked by standing for fifteen minutes, walking for thirty minutes, or sitting for fifteen to twenty minutes. R. 692. On examination, she had intact sensation and strength, but also experienced minimal low back pain upon seated straight leg raise on the left at ninety degrees. *Id.* At a follow-up appointment the day after her operation, Sellers reported that her weakness and axial pain were partially resolved, and she ambulated with a steady gait. R. 711–12.

Sellers informed Cibele Altemar, P.T., and Dr. Morris on September 19 that she had begun to experience pain and stiffness on her right side. R. 687–90. PT Altemar advised her to continue her strengthening exercises, and Dr. Morris prescribed Norco for pain. *Id.* During October 2013, Sellers continued to complain of lower back pain with activity and indicated that she was seeking stronger pain medications from her primary care provider. R. 680–86. Another MRI, taken on November 13, showed at L4-L5 mild foraminal narrowing bilaterally without nerve root impingement and at L5-S1 persistent mild bilateral foraminal narrowing without nerve root impingement and no recurrent herniated disc or significant epidural fibrosis or spinal stenosis. R. 751–52. An X-ray taken on November 22 showed DDD at L5-S1 and grade 1 retrolisthesis of L5 on S1 on extension. R. 753.

11

On December 20, Joseph C. Campbell, M.D., an orthopedic surgeon, wrote a note excusing Sellers from work through February 20, 2014. R. 609. On January 13, 2014, Sellers complained of back pain greater on the right than the left with numbness and pain in her legs after standing for any period, and she stated that she gained no relief from occasional ibuprofen and spent a majority of her day in bed or a recliner. R. 661. A few days later, Dr. Ghandi at LSI opined that she would need a lumbar fusion and ordered a new MRI, R. 659, which showed no significant change from the MRI taken in November 2013, R. 645–46. On February 13, Sellers complained of lower back pain intermittently radiating into her hips and buttocks and continuous pain and numbness down both posterior thighs and calves. R. 655. The following day, Dr. Gandhi reviewed Sellers's recent MRI and recommended a caudal ESI and physical therapy. R. 654. The last relevant medical evidence in the record is another note from Dr. Campbell, dated February 17, that extended Sellers's work absence through April 17. R. 615.

B.    *Medical Opinions*

1.    *PT Turner*

On July 10, 2012, James Turner, P.T., at Danville Orthopedic and Athletic Rehabilitation, Inc., evaluated Sellers's physical functioning. R. 457–60. During her evaluation, Sellers lifted twenty-nine pounds, carried thirty-four pounds with two hands, pushed forty pounds, and pulled forty-five pounds. R. 459. She exhibited an ability to frequently sit, walk, and rotate her trunk while sitting and standing; occasionally stand, work with her arms overhead, work while kneeling, climb stairs, and crawl; and never work while bent over or squatting. *Id.* She displayed adequate balance on level and uneven surfaces. *Id.* PT Turner observed self-limiting on 18% of tasks, which fell within normal limits, and no evidence of testing inconsistencies or making tasks more difficult than necessary. R. 457–58.

12

On examination, he found no indication of neurological deficits or abnormal lower extremity and trunk range of motion tests, but he did observe asymmetrical posture, tenderness to palpation over the sacroiliac joints and iliopsoas with increased lumbosacral muscle tone, and antalgic motion through forward bending and return to extension. R. 457. He noted that Sellers could tolerate repetitive use of both hands and feet and could constantly handle, finger, and feel, but could only frequently reach at the waist and occasionally reach below the waist. R. 458.

PT Turner concluded that Sellers could perform work at the light level, but could not sustain this level of exertion through an eight-hour workday, as shown by her decreased performance over the course of the three-and-a-half hour examination. R. 457, 460. He found that Sellers had major areas of dysfunction in dynamic strength and position tolerance because of generalized deconditioning, pain in the lumbosacral spine of a mechanical nature, and self-limiting behavior. R. 460.

2. *Dr. Cousins*

On July 23, 2013, DDS consulting examiner Christopher Cousins, Ph.D., evaluated Sellers's mental functioning. R. 578–83. He observed that Sellers drove herself to the appointment and arrived early. R. 578. She had good grooming and hygiene, introduced herself appropriately, and was cooperative throughout the examination. *Id.* Dr. Cousins noticed that Sellers appeared to be somewhat stiff when she got out of her seat to walk to the waiting room, but she otherwise did not display abnormalities in gait. *Id.* She had normal posture but frequently shifted in her seat, which she claimed was in effort to relieve her pain. *Id.* Her affect was restricted, mood was somewhat subdued, and she twice became tearful when discussing her health. *Id.* Sellers described getting along well with her family and stated that she dropped out of

high school in the tenth grade and never got her GED. R. 579. She explained to Dr. Cousins that she had worked as a truck driver until she injured her back. *Id.*

Sellers described her treatment for her back pain, noting that her "doctors in South Boston said there was nothing wrong with me," but instead "think it's in my head." *Id.* Specifically, she described the incident following her MBNB with Dr. Fraifeld, at which time she lost feeling in her leg, *see* R. 434–35, a reaction which she attributed to the injection procedure. R. 579–80. Sellers also described the operation she underwent in January 2013. R. 580. She denied ever having been hospitalized for psychiatric reasons or having received outpatient mental health services, but she did state that she took alprazolam. *Id.* Sellers claimed that during the day she would get up every one to two hours to try to do activities around the house, but had difficulty with these. *Id.* She stated that she tried to cook a meal every day and she shared cooking and shopping responsibilities with her husband. R. 580–81. Sellers also claimed difficulty falling and staying asleep, less enjoyment of activities she used to like, and no social contact with friends. *Id.*

On examination, Sellers stated that she was usually happy when she was not in pain. R. 581. She denied hallucinations, delusions, or intention to harm herself or others. *Id.* She was oriented to person, time, and place. *Id.* Her immediate memory was good, recent memory was fair, and remote memory was fair. *Id.* Her general fund of information was poor, calculation ability was fair, abstract thinking ability was fair at best, and judgment and common sense reasoning ability were fair to good. *Id.* She could perform basic activities of daily living and manage her funds. R. 581–82. Dr. Cousins diagnosed mood disorder due to chronic back pain with depressive features, ruled out pain disorder, and assessed a global assessment of functioning

14

("GAF") score of 60.[7] R. 582. He observed no evidence of malingering or symptom exaggeration. *Id.*

Dr. Cousins opined that Sellers's depressive symptoms, such as tearfulness, sadness, insomnia, and low energy, appeared to be primarily related to her physical limitations caused by her back pain. *Id.* He noted that there was some question of Sellers's pain being psychological in nature—citing in particular to some occasionally normal or mild examination findings and Dr. Fraifeld's note of disproportionate symptoms following her MBNB procedure—but found this was outweighed by the significant physical causes of Sellers's back pain, as evidenced by her continued pain following her surgery and diagnoses of disc problems. *Id.* He therefore was not confident in offering a diagnosis of pain disorder. *Id.*

As to Sellers's functioning, Dr. Cousins determined that she was capable of performing simple and repetitive tasks, may be able to perform some specific detailed and complex tasks, and would not require special instructions or additional supervision because of intellectual deficits. R. 582–83. He found that because of Sellers's perception of pain, she would struggle to maintain regular attendance in the workplace, perform work activities on a consistent basis, and

---

[7] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (*DSM-IV*). The GAF scale is divided into ten 10-point ranges reflecting different levels of symptoms or functioning, with 1–10 being the most symptomatic or least functional, and 91–100 being the least symptomatic or most functional. *See id.* The ranges do not distinguish between symptoms and functional impairments. *See id.* Thus, when "the individual's symptom severity and level of functioning are discordant, the final GAF [score] always reflects the worse of the two." *Id.* at 32–33. A GAF score of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

The American Psychiatric Association now cautions that GAF scores do not adequately convey the information needed to assess an individual's mental state, functional capacities, or treatment needs over time, and it recommends that clinicians cease using them for assessment. *See* Am. Psychiatric Ass'n, *Frequently Asked Questions About DSM-5 Implementation—For Clinicians* (Aug. 1, 2013), http://www.dsm5.org/Documents/FAQ%20for%20Clinicians%208-1-13.pdf. Though GAF scores may be questionable diagnostic tools, changes in assessed scores may still reflect a clinician's observation of improvement or deterioration in their patient.

complete a normal work day or week without interruption. R. 583. He determined that Sellers would not have difficulty in her social functioning and would have mild difficulty coping with the typical stresses encountered in competitive work. *Id.*

Dr. Cousins completed another mental functioning form on August 29, 2013. R. 598–600. He reported that Sellers would have no difficulty in understanding, remembering, or carrying out simple instructions, or with making judgments on simple work-related decisions. R. 598. He determined that she would have mild difficulty in these areas regarding complex instructions and decisions. *Id.* He noted no difficulties in Sellers's ability to interact appropriately with supervisors, coworkers, or the public. R. 599. He explained again that because of Sellers's perception of pain, she would have difficulty maintaining regular attendance, performing work activities consistently, and completing a normal work day or week without interruption. *Id.*

### 3. Dr. Carter

On August 17, 2013, DDS examining consultant William Carter, M.D., evaluated Sellers's physical functioning. R. 585–95. Sellers stated that her chief complaint was her back pain, which prevented her from climbing into her truck or bending over to grab objects and required her to take multiple breaks while performing housework. R. 585–86. She stated that her surgery provided only short-term pain relief and claimed that ESIs and pain medications were ineffective. R. 585. She described her pain as located in the left side of her back and down the posterior aspect of the leg, which Dr. Carter determined was an S1 distribution. *Id.*

On examination, Sellers exhibited no acute distress, did not use an assistive device, was alert and oriented times three, had a logical and linear thought process, and showed no deficits in concentration or ability to follow multistep commands. R. 586. Range of motion was normal

16

throughout, strength was 5/5 in all extremities, sensation was intact, and reflexes were normal. R. 587. Coordination, station and gait, finger-to-nose, Romberg, and rapid alternating movements were all within normal limits. *Id.* Pelvic compression was negative, but Faber's exam (bilateral), straight leg raise, pelvic rock, and numbness of the left leg while laying flat were all positive. *Id.* Dr. Carter determined that Sellers's pain was of a mixed nature, with some aspects appearing to be discogenic pain and other aspects more suggestive of a stenosis. *Id.* Regarding stenosis, he noted that surgical intervention made things very complicated. *Id.* Dr. Carter indicated that Sellers's prognosis was fair at best, unlikely to improve, with potential for worsening as is common following back surgery. *Id.* He found Sellers to be fairly credible. R. 588.

As to Sellers's functioning, Dr. Carter determined that she could stand for four to six hours and walk four to six hours in an eight-hour workday. *Id.* Sellers's ability to sit was limited by the pain from her disc, and she therefore would be able to sit for only two to four hours per day and not continuously. *Id.* She could lift or carry twenty pounds occasionally and ten pounds frequently. *Id.* Dr. Carter opined that Sellers should bend and perform other activities of forward flexion only rarely, but she could squat with no clear restriction. *Id.* She had no manipulative, visual, or communicative limitations, and she would not need an assistive device to ambulate. *Id.*

Along with his narrative report, *see* R. 585–88, Dr. Carter also submitted a checkbox form that described Sellers's functioning, *see* R. 590–95, which differed in some ways from his conclusions in the narrative description. On the checkbox form, Dr. Carter stated that Sellers could sit, stand, or walk for only one hour at a time without interruption; sit four hours total per day; and stand or walk three hours total per day. R. 591. He found that Sellers could continuously handle, finger, and feel; frequently reach overhead and operate foot controls; and never or occasionally push and pull. R. 592. As to postural activities, Dr. Carter noted that

Sellers could frequently balance; occasionally kneel, crawl, stoop, or climb stairs or ramps; and never climb ladders or scaffolds. R. 593. He attributed these postural limitations to Sellers's back pain, explaining that she had difficulty stepping up to the examination table. *Id.* He also assessed some environmental limitations, noting that Sellers could frequently be exposed to moving mechanical parts and could operate a motor vehicle (albeit limited by time tolerance). R. 594. Sellers could perform everyday activities except for climbing a few steps at a reasonable pace with the use of a single hand rail. R. 595.

     4.     *DDS Reviewing Experts*

As part of the initial review of Sellers's claim, DDS experts Linda Dougherty, Ph.D., and J. Astruc, M.D., assessed Seller's mental and physical functioning, respectively. R. 76–78. In reaching the conclusion that Sellers did not suffer from a severe mental impairment, Dr. Dougherty found that she had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. R. 76. Dr. Astruc, evaluating Sellers's physical RFC, found that she could lift or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours and sit for six hours in an eight-hour workday; balance for unlimited duration; and occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. R. 77–78.

On reconsideration, DDS reviewer Stephen P. Saxby, Ph.D., affirmed Dr. Dougherty's findings from the initial review of Sellers's mental functioning. R. 89. Martin Cader, M.D., also affirmed Dr. Astruc's physical RFC findings, except he determined that Sellers was less restricted in some postural activities, finding instead that she could frequently kneel, crouch, crawl, and climb ramps and stairs. R. 90–92.

C.     *Sellers's Submissions and Testimony*

As part of her application for benefits, Sellers submitted a function report dated May 23, 2012.[8] R. 221–29. In her report, she stated that on a typical day she did "little things around the house," but would need to sometimes sit down and take her medications. R. 223. She claimed that because of pain, she could no longer clean, cut the grass, shop, cook at cookouts, do yard work, or drive a truck for her job. R. 224. She did not claim difficulties in her personal care, and she stated that she could cook simple meals, but would need her husband to finish cooking for her if her pain became too bad. R. 224–25. She could fold clothes and put them in the wash, but needed her husband's help carrying them. R. 225.

Sellers stated that she went outside several times per day to sit on the porch and get fresh air and she could drive a car and go shopping with her husband. R. 226. She expressed no difficulty in handling money. R. 226–27. She watched television, but could no longer fish, boat, cook out, or bowl, which she used to enjoy. R. 227. Sellers stated that she talked to her family every day on the phone and took trips to the doctor and grocery store, but she otherwise did not have much of a social life. R. 227–28. She claimed that her pain affected her ability to lift, squat, bend, stand, walk, sit, kneel, and climb stairs. R. 228. She could pay attention for as long as she needed and could follow written and spoken instructions. *Id.* Sellers stated that she got along well with authority figures and handled stress okay except for getting frustrated with no longer being able to do activities. R. 229.

In testimony before the ALJ, Sellers stated that back pain limited her ability to go out except for driving to the grocery store once or twice per week. R. 40. She claimed that her pain was constant, had gotten worse since its initial onset in September 2011, and was exacerbated by physical activity. R. 41–42. She also testified that the numbness in her legs caused difficulty with

---

[8] Although the ALJ stated in his opinion that this report was undated, R. 18, a final page of the report, including the date, appears in the record (albeit filed out of order from the rest of the report). R. 221.

walking and balancing and as a result she stumbled or fell two or three times per week. R. 42–43.

Sellers stated that her back surgeries provided some relief for a few months before her symptoms

returned, and she claimed that injections were not helpful. R. 43–45. She claimed that she could

stand for five to ten minutes at a time, could not walk a full city block without stopping, and was

unable to lift a gallon of milk without pain. R. 45–47. She also explained that her pain made it

difficult for her to sleep through the night and as a result her fatigue caused problems with her

concentration and memory. R. 47–48. Sellers claimed that she experienced depression because

she could no longer do activities that she used to be able to perform, and she became more easily

stressed. R. 48–51.

D.    *ALJ Kilbane's Decision*

ALJ Kilbane found that in spite of Sellers's functional limitations, she was still able to

perform work and therefore was not disabled. In considering whether Sellers's mental

impairments met the severity of a listing, he found that she was mildly restricted in activities of

daily living, had mild difficulties in social functioning, and had moderate difficulties maintaining

concentration, persistence, or pace. R. 17–18. With regard to his RFC determination, the ALJ

explained that the record did not support Sellers's allegations of the severity of her symptoms. R.

22. He found that Sellers's surgeries were relatively effective in controlling her pain, that her

May 2012 EMG study of the lower extremities was "unimpressive," and that physical

examinations did not consistently reveal abnormal gait or significantly decreased strength,

sensation, or range of motion, as would be expected with the severity of symptoms Sellers

alleged. *Id.* Furthermore, he found that Dr. Fraifeld's report of disproportionate symptoms

following Sellers's April 2012 MBNB and his later report of Sellers's anxiety and

noncompliance with medications suggested that Sellers's symptoms were not entirely secondary

to her physical impairments. R. 22–23. In addition, he found that Sellers's claim of falling several times per week was not reflected in the treatment records. R. 23.

ALJ Kilbane also weighed the medical opinion evidence in the record. He gave little to no weight to PT Turner's opinion that Sellers's functioning would be expected to deteriorate over the course of an eight-hour workday. *Id.* He explained that this opinion was not entitled to much weight because PT Turner was not a medically acceptable source under the regulations, his opinion was based on a single examination rather than a longitudinal review of the record, and his findings were inconsistent with contemporaneous medical evidence showing that Sellers had full extremity strength and a normal gait. *Id.* The ALJ then reviewed Dr. Cousins's opinions, assigning great weight to his conclusions to the extent they reflected only mild impairments, as these findings were generally consistent with Sellers's lack of treatment by a mental health professional and the overall lack of mental health complaints in the record. R. 23–24. He gave little to no weight, however, to the portions of Dr. Cousins's opinions describing limitations that were secondary to her pain, noting that Dr. Cousins was skeptical of assigning a diagnosis of pain disorder and that "any opinion as to her non-somatic pain would appear to be outside his area of expertise." R. 24.

The ALJ next assessed Dr. Carter's opinions, giving great weight to the narrative opinion, which he found to be consistent with the medical evidence of record. *Id.* He gave only partial weight, however, to the checkbox form completed by Dr. Carter, noting that some limitations identified therein, including Sellers's ability to reach overhead only frequently and her ability to stand or walk for a maximum of three hours, were markedly different from the limitations set forth in Dr. Carter's narrative opinion. R. 24–25. He determined that Dr. Carter's narrative opinion was more likely than the checkbox form to reflect his true assessment of Sellers's

21

functioning, and he also noted that the more restrictive limitations in the checkbox form were inconsistent with the medical evidence of record, including Sellers's full extremity strength and range of motion. R. 25. The ALJ assigned little to no weight to Dr. Campbell's notes excusing Sellers from work because these notes were conclusory and inconsistent with the unremarkable examination findings in the record. *Id.* Finally, the ALJ gave partial weight to the opinions of the DDS experts, explaining that although these experts were not treating or examining sources, their opinions were somewhat consistent with the medical evidence, including treatment notes and radiographic studies. *Id.*

## IV. Discussion

On appeal, Sellers challenges the ALJ's determination of her RFC—the most an individual can do on an ongoing basis despite his or her impairments, 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). In particular, she argues that the ALJ improperly evaluated the opinion evidence, Pl. Br. 11–19, ECF No. 21, and that he failed to explain why he did not include limitations in Sellers's ability to maintain concentration, persistence, and pace, despite having found moderate difficulty in this area of functioning at step three, *id.* at 19–20.

A.      *Opinion Evidence*

Sellers first contends that the ALJ should have evaluated a portion of Dr. Morris's treatment notes as medical opinion evidence. *Id.* at 15. The note to which Sellers cites—a record of her condition immediately prior to her surgery on August 23, 2013—states as follows:

> SURGICAL INDICATIONS: This 53-year-old woman from North Carolina is well known to me from a mid January 2013 L5/S1 laminotomy foraminotomy and decompression for the 5th nerve. She improved about 95%, but slowly all of her symptoms have recurred. She is unable to do housework. Her symptoms are provoked by standing 15 minutes where her preoperative was five minutes,

22

walking 30 minutes where her preoperative was five minutes and sitting 15 to 20 minutes where her preoperative was 15 minutes.

R. 692. Sellers argues that because this note includes descriptions of her functioning and symptoms, the ALJ needed to analyze and weigh it in his RFC discussion. Pl. Br. 15.

An ALJ must consider and evaluate all opinions from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. § 404.1527. The ALJ must explain the weight given to all medical opinions, *Radford v. Colvin,* 734 F.3d 288, 295–96 (4th Cir. 2013), and his "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight,'" *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (citing SSR 96-2p, 1996 WL 274188, at *5 (July 2, 1996)). The Commissioner argues, however, that the ALJ had no obligation to assign any weight to this portion of the record because the description of symptoms was not a medical opinion, but rather a notation of Sellers's subjective complaints. Def. Br. 10–11, ECF No. 27. The Commissioner's argument is persuasive.

Under the regulations, "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2); *see also id.* § 404.1527(c)(2) (distinguishing treating source opinions from "objective medical findings alone or from reports of individual examinations"). There is no indication that the portion of the record in question reflects Dr. Morris's judgment of Sellers's functional abilities. Rather, it appears simply to be a notation of Sellers's own subjective description of her symptoms, which is not a medical opinion. *See Morris v. Barnhart*, 78 F. App'x 820, 824–25 (3d Cir. 2003) (citing *Craig*, 76 F.3d at 590 n.2)

23

("[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion."); *Culpepper v. Astrue*, No. 3:09-cv-397-J-MCR, 2010 WL 3259589, at *12 (M.D. Fla. Aug. 18, 2010) (finding that there was no medical opinion where the record contained treatment notes, including diagnoses, but no description of work-related limitations and no separate opinion or medical source statement); *Burden v. Astrue*, 588 F. Supp. 2d 269, 275–76 (D. Conn. 2008) (finding that statements from doctor's report were merely notes of self-reported symptoms, rather than a medical opinion). Moreover, nothing in this treatment note suggests that Dr. Morris adopted Sellers's report of symptoms as his opinion of her functional ability. Because these notes were not a medical opinion within the meaning of the regulations, the ALJ did not err in failing to treat them as one.

Sellers also disputes the ALJ's decision to give greater weight to the narrative portion of Dr. Carter's opinion than he gave to the checkbox portion of that opinion. Pl. Br. 15–19. She contends that the ALJ's explanation for doing so—that an opinion rendered in narrative form would be more persuasive than one completed on a checkbox form—is impermissibly arbitrary and that the decision to credit one opinion over the other constitutes cherry picking. *Id.* at 16. This argument is unavailing. Judges in this District have recognized that medical opinions completed on checkbox forms, with no written explanation of the reasoning underlying the opinion, are of limited probative value. *See Shelton v. Colvin*, No. 7:13cv470, 2015 WL 1276903, at *3 (W.D. Va. Mar. 20, 2015) (collecting cases). Conversely, Dr. Carter's narrative opinion provided findings and rationale in support of his conclusions. It was therefore reasonable for the ALJ to conclude that to the extent the narrative and checkbox opinions contradicted each other, the narrative opinion was better supported and more accurately reflected Dr. Carter's assessment.

24

Furthermore, the form of these opinions was not the only reason the ALJ stated for giving more weight to the narrative version. The ALJ also noted that the more restrictive limitations in the checkbox opinion were inconsistent with the unremarkable examination findings in the record, particularly Sellers's demonstration of full extremity strength and range of motion. R. 25. The ALJ cited ample evidence in support of this finding. R. 24–25. Although Sellers notes that other facts established in the record, including her surgical history, positive responses on examination to palpation and provocative tests, and her subjective complaints, tend to support a finding of greater limitations, Pl. Br. 17–19, this does not mean that the ALJ's conclusion was erroneous. Because the ALJ explained his reasoning for giving greater weight to Dr. Carter's narrative opinion and this reasoning finds more than a scintilla of support in the record, his treatment of the medical opinions is supported by substantial evidence.

B.    *Concentration, Persistence, or Pace*

Sellers also argues that the RFC and corresponding hypothetical posed to the VE at the administrative hearing should have included moderate limitations in her ability to maintain concentration, persistence, or pace, as the ALJ identified at step three. Pl. Br. 19–20. This argument invokes the Fourth Circuit's opinion in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). In *Mascio*, the court considered whether the ALJ erred by adopting as his RFC a hypothetical posed to the VE that did not include any mental limitations other than a limitation to unskilled work, despite having found at step three that the claimant had moderate difficulties in maintaining concentration, persistence, or pace. *Id.* at 637–38. The court found that the limitations included in the RFC were narrower than those identified by the ALJ at step three. It reasoned that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical to simple, routine tasks or unskilled work'"

25

because "the ability to perform simple tasks differs from the ability to stay on task." *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). Finding that the ALJ failed to give any explanation of why his step-three finding did not translate into a work-related limitation in the RFC, the court determined that remand was necessary. *Id.*

Here, the Commissioner argues that the ALJ's opinion and the record provide an adequate explanation of why Sellers's moderate difficulties in concentration, persistence, or pace were fully accommodated by a limitation to simple and repetitive tasks with the possibility of performing some specific detailed or complex tasks. *See* Def. Br. 14–16. She notes that Sellers did not seek out mental health treatment from a specialist and that progress notes showed normal psychiatric findings on examination. *Id.* at 16. Furthermore, the ALJ specifically gave less weight to the portions of Dr. Cousins's opinion concerning Sellers's limited ability to perform activities consistently, complete a normal workday or workweek, and maintain regular workplace attendance, while more favorably crediting the portions of Dr. Cousins's opinion regarding only mild deficiencies in following instructions and handling stress. R. 23–24.

Although these factors, when viewed in isolation, would support a finding that Sellers did not require any additional restrictions beyond a limitation to simple and repetitive tasks, the ALJ did not reconcile these findings with his earlier, contradictory analysis. At step three, the ALJ explained his finding of moderate difficulties with regard to concentration, persistence, or pace, as follows:

> [Sellers] asserted in her . . . Function Report that her conditions did not affect her abilities to memorize, complete tasks, concentrate, understand, or follow instructions. She indicated that she was able to pay bills, count change, handle a savings account, and use a checkbook/money orders. The claimant reported that she was able to watch television. [R. 222–29].

R. 18.

This explanation provides little clarity as to which aspects of Sellers's functioning the ALJ found to be the basis of her moderate difficulties regarding concentration, persistence, or pace, except to show that such a limitation existed in spite of Sellers's ability to, among other things, understand and follow instructions and handle her finances. *Cf. Claiborne v. Comm'r*, No. SAG-14-1918, 2015 WL 2062184, at \*2–3 (D. Md. May 1, 2015) (finding that the ALJ's "cursory analysis," which stated that the claimant reported difficulty concentrating and remembering, but could independently perform activities of daily living, "suggests that the finding of 'moderate difficulties' was based exclusively on Ms. Claiborne's statements that she experiences issues with concentrating and remembering, since the sole remaining sentence in the analysis would suggest mild or no limitations").

In spite of the Commissioner's argument to the contrary, I cannot consider only the ALJ's RFC explanation and disregard his step-three findings. *See id.* at \*4 (noting that the ALJ's findings at steps two and three "are supposed to represent reasoned consideration of all of the pertinent evidence, and are not simply an opportunity to give the claimant the benefit of the doubt at one step while taking it away at the next step"). Furthermore, where an ALJ makes contradictory findings as to a claimant's functional ability, it is not enough to say that the record evidence, even if recited by the ALJ, provides substantial evidence for the ALJ's RFC determination absent an adequate explanation that reconciles the conflicting findings. Here, the Court is unable to discern how Sellers's difficulties in concentration, persistence, or pace, which the ALJ found to be moderate, are properly accounted for by a limitation to simple repetitive work. *See Perdue v. Colvin*, No. 7:14cv173, 2015 WL 5771813, at \*6 ("[W]hen the Law Judge believes that a particular claimant's impairments in concentration, persistence, and pace do not affect the claimant's capacity for simple, routine, or unskilled work, it seems only reasonable

27

that the Law Judge should explain this finding, in relation to the medical record."). Because no such explanation is apparent from the face of the ALJ's decision, remand is necessary so that the ALJ may make his reasoning clear. Without a proper RFC analysis, I cannot find that the ALJ's RFC determination is supported by substantial evidence.

## V. Conclusion

For the foregoing reasons, I find that substantial evidence supports the ALJ's analysis of the opinion evidence. The ALJ failed, however, to provide an adequate explanation for his finding that Sellers needed no further limitation regarding her difficulties in maintaining concentration, persistence, or pace. I therefore find that the Commissioner's final decision is not supported by substantial evidence. Accordingly, I respectfully recommend that Sellers's motion for summary judgment, ECF No. 20, be **GRANTED**, the Commissioner's motion for summary judgment, ECF No. 26, be **DENIED**, this case be **REMANDED** for further administrative proceedings, and this action be **STRICKEN** from the docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: January 24, 2017

Joel C. Hoppe
United States Magistrate Judge